Okay, Mr. Medlock. May it please the court, Scott Medlock for the appellant Maria Arenas, the mother of Richard Tavera. Corrections officer John Calhoun waited seven minutes to rescue Maria Arenas' son when he was found committing suicide in prison. Although the prison's policies required Calhoun to, quote, immediately cut down the hanging inmate, Calhoun instead stood back and spent time completing paperwork. This court observed in Hyatt v. Thomas that, quote, America faces an epidemic of suicide by individuals in custody. He was awaiting the arrival of other officers for part of that time, and there was an inadvertent, I assume you don't say that it was intentional, confusion about which key to use to get the cell unlocked. So it wasn't as though they were just lackadaisically sitting around doing paperwork or reading a newspaper or something. Well, I would say that there is a significant amount of time, Judge Smith, where he isn't doing anything. The record shows that in the first 30 seconds is when he makes the radio calls to summon other officers, and we certainly agree that that's reasonable because the policy required him to first call for backup and then immediately cut down the hanging inmate. And, of course, we would agree that getting the wrong key is merely negligent. We would certainly agree with that. But that delay only compounds another 20 seconds. What if the backup had come, as I'm sure he expected, within a minute and a half? Then we wouldn't have – I don't think we would have an issue if it was within a minute and a half. So really your case turns on at some – there isn't an immediate duty to enter alone and cut down. Your case turns on at some point the reasonableness of waiting for backup when backup doesn't come. The Eighth Amendment requires the officer then. So is that correct? That's correct, Your Honor. Okay. That's very important for me that you are not saying the Eighth Amendment requires a solitary officer to go in immediately. Well, the policy does – I'm not asking the policy. Yes. You're correct, Your Honor. Of course, the policy should inform what his Eighth Amendment duties are. That should give him instruction that it's not reasonable to stand around for five or seven minutes and wait for other officers. And, of course, we know from the record that after five minutes other officers were there. In fact, Officer Calhoun's affidavit, which is at the record in page 265, says that it is safest to enter when there are three officers present. And we know that after five minutes we see on the video Sergeant Shelby and Officer Haas have arrived at that point. Then we wait another two minutes to enter the cell. That gives us a certain two-minute delay where I would say that the officers are doing nothing. There's no evidence that they were doing anything to assist Mr. Tavera other than standing around and waiting for a second supervisor to arrive. Well, the video is pretty clear. It will control what we see. It looked to me like they are against that door and they are banging on the door, and then Calhoun runs to get the right key. As Judge Rodriguez pointed out, I'm not sure it's fair and the video will decide. I don't see anyone sitting around. It seems like the second they're there, they're up against that door, and then they have the bad key. Well, they also know that at that point, Your Honor, that Mr. Tavera has been hanging for five minutes. You can hear on the video the Handycam, which is at record 767, that one of the supervisors asked Mr. Calhoun, how long do you think he's been hanging, and he says five minutes. Lieutenant Dixon said that in his training that he was trained that you have three to four minutes to rescue someone who's hanging. So they know at that point that he's been hanging for five minutes, that three to four is the window that you really need to get in there, and they really are not doing much. I would say the Eighth Amendment, of course, does not require. In this court, in Jacobs v. West Feliciana, Sheriff's Department said that you don't have to do everything possible, that you can take some actions and still be deliberately indifferent. In that case, there was evidence that the sheriff's officers had done some things. They had increased the watch requirements for the inmate. They had taken some of her materials away, but they didn't confiscate the blanket that she ultimately used to hang herself. That is, while one of the officers in the cave, in Jacobs, they found was merely negligent, but the sheriff and the supervising officer, they found, were deliberately indifferent, despite them having taken some measures to protect the inmate. I would say that banging on the cell door when you know that he's been hanging for five minutes and you know that three to four minutes is your window where you have to rescue him is akin to deliberate indifference, as this court found in Jacobs v. West Feliciana. The important reasons why the court should reverse and remand here, though, are two. The first is that the district court erred by resolving fact disputes in Calhoun's favor, specifically finding that the policy didn't control and was not applicable at the prison when the policy clearly says that you have to enter the cell immediately and cut down the hanging inmate. When you filed the motion to reconsider and the district court issued its response to that, I read it basically as say, I'm not resting on the policies. I believe that a large portion of the court's order did rest on the policies. Ultimately, even after the motion to reconsider, and I think that is something that the jury should certainly be informed as to what the reasonable response of the officers was. Whether the policy applies is a critical portion to determining what response is reasonable. The Tenth Circuit in Tafoya v. Salazar said that reasonable officers are informed by policies. The Seventh Circuit said the same thing in the state of Clark. And the Sixth Circuit said so in Nalani v. Wayne County. Now, the case that the district court relied on in ruling on the motion to reconsider is a district court case from Texas. That case, the policy didn't have anything to do with the protection of the inmate's constitutional rights. We're certainly not saying that because there's a policy that that creates a constitutional right. That's not the argument here. We're saying that when the policy has to do with these life safety issues and the policy is reasonable, you need to follow the policy. Which specific policy are you referring to now? We're referring to the only written policy document that's in the record. It's at Record 498, and the critical page is Record 508. That's the policy that says when an inmate is discovered hanging, staff will immediately initiate appropriate first aid measures. In the event that any inmate is found hanging, the correctional officer will call for backup by radio and then immediately cut down the hanging inmate and initiate CPR. Which policy number is that? The policy number is, I believe it's VG680001. But that didn't apply to administrative segregation, did it? There's no evidence that it didn't, and it's certainly a fact dispute that needs to be resolved by the jury. Both of Officer Calhoun's direct supervisors, Sergeant Shelby and Lieutenant Dixon, both testified that the policy applies in the situation. That they prevaricated later is exactly the kind of issue that the jury needs to resolve. The jury needs to weigh their testimony under cross-examination at deposition versus their later backtracking in their affidavits and their declarations that were filed with the court. It's very telling, Judge Smith, that none of the policies that Officer Calhoun refers to are actually in the record. We have description of policies saying what the practice was at the Smith State Prison, but we do not have any actual policy documents. The only policy document in the record is at 498 through 508, the policy that the plaintiff appellant is relying on. That, I think, is critical and certainly something that the jury could weigh, descriptions of the policies versus an actual written policy. Moreover, there's a robust consensus of courts in the 6th, 7th, 8th, and 9th Circuits where the circuit courts all looked at this exact fact scenario, an officer finding a prisoner in the act of committing suicide and said that the reasonable reaction was to immediately cut down the inmate. And to go to your concerns about the application of the policy. But you made that statement of law. Yes. Let's go through those, the 6th Circuit. The 6th Circuit opinion is Heflin versus Stewart County, Tennessee. Right. In that case, the Court of Appeals affirmed a trial, a verdict. But Heflin, the officer, had gone in. And he didn't cut him down when he's standing next to him and another person says, here's a knife. That's correct. To me, that's factually different. And in the same year, the 6th Circuit says, and I'll quote, no case has been brought to this court's attention which recognizes a constitutional duty on the part of jail officers to immediately cut down a prisoner found hanging in his or herself. That's Rich. That's Rich, correct. Notably, Rich was decided before Heflin. But Heflin, you've agreed with me, is just different. If an officer goes in and stands next to a hanging person with no pulse and someone else says, here's a knife, and he says, no, get out, that doesn't resemble the safety consideration that's been articulated here at all. Well, to look at the – I would agree that there's some factual differences between Heflin and this case. The more applicable cases are the 7th Circuit's opinions in the state of Miller v. Tobias and Sandville v. McCautry. And perhaps the most applicable case is the 8th Circuit's opinion in Olson v. Bloomberg. Okay, but Miller, again, these are important to look at. Miller doesn't have much discussion, but it does say, plaintiff further alleges security officers, plural, waited to assemble an entry team and then applied restraints before removing the ligature. So I was looking at that case as closely as I could. Severson is the officer that first finds him. That's correct. I don't see the 7th Circuit ever saying anywhere clearly that Severson had an immediate duty to go in himself. Well, Severson filed a motion to dismiss. But I'm just asking you, did the 7th Circuit say that in any clear way? I'd have to look at the opinion again, Your Honor. I do believe that because Severson filed a motion to dismiss, asserting qualified immunity, the motion was denied, and the facts are very similar to here. You're right. I don't think that it lays out exactly like Severson had a duty at this point. And then you've, I think, modified, but I accept it, your position. You're not saying that you think there's an immediate duty to enter alone. You're saying it is reasonable under the Eighth Amendment to call and wait for backup. But you're saying at some point in time deliberate indifference exists. That does make sense to me. I suppose if 10 minutes go by and the body is totally inert, there couldn't be a danger. And you're saying it's a shorter period of time. Yeah, that may be true. I haven't thought it through well enough. Well, and here, your Honor, I think that it's also critical that some of the concerns about faking and the condition of whether the inmate, Mr. Tavera, was actually going to attack Officer Calhoun, some of those conditions are taken away by Officer Calhoun's testimony that he thought it was a genuine attempt, that he saw that the noose was tight and that Mr. Tavera's body was limp. But looking at the video, there must be 50 different cells in that one room. That's correct. Can he, as the only officer there, can he go into one and leave the rest there? What if there's a fire or something? It would seem to me he almost has to wait outside. Well, he knows that backup is on the way, your Honor. He knows that they're responding. He's talked to them on the radio. He also knows that all of the inmates are locked in their cells. This is not a situation like in Tlamka v. Sarrell where the inmate has a heart attack in the middle of the corrections yard and still the officers are denied qualified immunity. This is a situation where everything is as controlled as it can be in a prison. And, again, that's an issue that the jury should have been given to resolve given the opposing testimony of the experts. Our expert, Commander Benasco, said that he would have ordered his officers to immediately go into the cell under these exact situations. But then you get to the plural right away, which is where his officers, that's assuming he had multiple. That was my officers commanding multiple officers. In this situation, one officer, he would have ordered him in. I think it's also very important to look at the Eighth Circuit's opinion in Olson v. Bloomberg where the facts are most like this. In fact, the inmate in Olson v. Bloomberg had multiple times that same evening said that he wanted to fight with officers, but the court still said that the officer had an obligation to cut down the inmate when he saw him preparing a noose, maybe not cut down, but enter the cell to provide immediate first aid. That's in tension with our Longoria case, correct? With the which case? The Longoria where we said, well, an officer doesn't have to jump into the cell. No, it's not in tension with Longoria because Longoria is about a fight between armed inmates. The key to Longoria, and I'm almost out of time, is that in Longoria the inmates are armed fighting each other. There is a duty to break up a fight between unarmed inmates. And I'll— You've saved time for rebuttal, Mr. — Yes. Thank you. Ms. Cusimano? May it please the court. I'm Ellen Cusimano on behalf of Officer John Calhoun. We're asking the court to affirm summary judgment to Officer Calhoun on the grounds that he did not violate the Eighth Amendment in responding to Mr. Tavera's suicide. Alternatively, we're asking the court to affirm summary judgment on the grounds that Officer Calhoun is entitled to qualified immunity in this case. Unless the court prefers otherwise, I'm going to address the Eighth Amendment issue first, followed by qualified immunity. To succeed on an Eighth Amendment claim in this case, Ms. Arenas had the burden of showing that Officer Calhoun acted with deliberate indifference in responding to her son's suicide. That is an extremely high burden to meet. It requires a showing of more than just mere negligence and more than even gross negligence. And here Ms. Arenas has not met that high burden. The evidence in the record shows that Officer Calhoun responded reasonably to the suicide while simultaneously preserving the safety and security of the prison. More specifically, the record shows that when he found Mr. Tavera, he immediately called for backup assistance. And he called for backup assistance four times until he received assurance that backup assistance was on its way. He then went to the control room to obtain what he believed was the key to the dormitory, and then he waited for backup assistance to arrive. Once backup assistance did arrive, he immediately went to the cell, attempted to open the door. Unfortunately, he did have the incorrect key. At that point, the videotape shows Officer Calhoun running to the control room to obtain the correct key and then running back to the cell, at which point he immediately opens the cell door and he helps the other officers lower Mr. Tavera to the ground. And then he videotapes the other officers provide Mr. Tavera with CPR for at least 20 continual minutes. All of these actions by Officer Calhoun were done to help Mr. Tavera. So in other words, this is not a case such as Grogan where Officer Calhoun truly did nothing. He did not refuse to help Mr. Tavera. He instead did all that he could do while still making sure that the safety of himself, other officers, and other inmates, and the general security of the prison was safe. I didn't see that, the latter three articulated below, safety of other offices, other inmates, security of the prison. I really thought the argument was he felt, even though he had the arm vest on, he would be unsafe going in. That is correct. He did feel that he would be unsafe going in. And the reason being, as we have discussed, is that if he had gone in by himself, unfortunately in the prison context inmates do contrive emergencies. And if that had been one of those situations here, that would have created a very potentially dangerous situation because at that point Officer Calhoun had the key that would unlock the cell door for every single cell in that dormitory. And so he also... That one key unlocks them all? That is correct. You also have the fact that this was administrative segregation, so you were dealing with inmates in that area who were relatively more dangerous than the general population. Absolutely. Inmates in administrative segregation are often placed there because they have in the past engaged in violent behavior. So there is a greater risk that violent behavior will occur when an officer enters that cell. There would be an issue of fact if he hadn't called at all. Yes. If he had not called... Or if the team, when they arrived, they just didn't go in. Absolutely. In that situation, that would be more like the case that the circuit decided in 2017 in Grogan v. Kumar. In that case, the inmate overdosed on medication and he was lying out on his floor. And the officers just completely... What about if he knew that the gentleman was suicidal? Would it at least be an issue of fact, especially given the policy, if he had known? It could be, but, Your Honor, that argument of whether Officer Calhoun knew that he was suicidal or should have foreseen he was suicidal, that was raised at the district court level. And the district court denied, granted summary judgment to Officer Calhoun on that issue. And that issue was not appealed to this court. It is undisputed on the record that this little window couldn't, cannot see the feet? Absolutely. That's undisputed. That is undisputed. When you look at the window, it is fairly small and it is... There are holes in the window. Officer Calhoun clearly testified that he could not see the inmate's feet. And he said that because of that, he did not know what he was getting himself into. So there was no way that he could have conclusively known whether this was a fabrication or whether this was a genuine attempt. Whether this gets past summary judgment, I'm guessing, therefore, would be different if over a five-minute span he goes back and he can see the man is hanging and inert and he gets a call by backup, say, saying, we can't get there for another ten minutes. Would it be deliberately indifferent for him to still wait for backup, no matter what length of time? I believe in that situation, even if Officer Calhoun could see that his feet was hanging, it depends on the facts of the case. So, for example, when Officer Calhoun was stationed in Guantanamo Bay, he encountered a situation where an inmate appeared for all purposes to be hanging off of the ground. And when he and, I believe, two or three other officers entered the cell, the inmate immediately jumped down from the noose and attacked the officers. So even then, you cannot conclusively know that there is no danger to the officers. And so what Officer Calhoun did here was consistent with his training and the practice of the prison, which is to never enter an inmate cell alone because of the obvious safety concerns that exist. Mr. Medlock says that it's a fact issue as to whether policy 68001 applied in administrative segregation. I'm not sure that's a fact issue, but whether it is or not, would you tell us what the record and the law show us on that? Absolutely. First of all, that policy begins on page 498 of the record. And that policy, while it is in effect for all Georgia prisons, it applies only in specific circumstances. And I believe the title in and of itself makes that clear. The title shows that it applies only to managing potentially suicidal inmates. The policy then goes on to discuss in detail the procedures that have to be followed for inmates who have been specifically identified as potentially suicidal. But I didn't understand that argument because it's clear this guy is suicidal. I mean, he does discover him to be. How could you more identify a person as suicidal when you see them hanging? Well, this policy applies to inmates who have been identified as potentially suicidal beforehand, and they have to go through a process of being evaluated by mental health professionals, and then they have to be placed in one of the six tiers of units that provides mental health services. And here Mr. Arenas had not been identified as potentially suicidal. He had not been seen by a mental health professional. He had not been placed in any of the six tiers of units to help mental health inmates. I also think it's important to look to the specific provision at issue in this case, which is at, I believe, page 509 of the record. The provision at issue is subsection C. But when you look at the provision directly above it, subsection B, it makes it clear that correctional officers who are assigned in those crisis stabilization units are required to have special emergency scissors that can be used to cut down inmates. That's at record 509, did you say? I believe so. I believe counsel— Mr. Medlock referred us only to 498 through 508. I mean, we can double check that. I'm not trying to nitpick. I just want to be sure what we need to look at. It is either at 508 or 509. I could have miscounted. But I believe it's at 509, and it's in the section D that is entitled emergency response. But the reality is that subsection C specifically refers to these emergency scissors used to cut down inmates, and it is undisputed that those scissors did not exist in the state prison because it is not a mental health prison, and it does not contain any of this crisis stabilization units that are referenced in this policy. And so for those reasons, this policy does not apply. However, even if this court were to determine that the policy did apply, the law is clear that the mere violation of a policy does not give rise to deliberate indifference. And that is something that this court reiterated last month in IF v. Lewisville Independent School District. And in that case, this court reiterated that the failure to comply with a school's regulations does not establish the requisite deliberate indifference. And I think that's particularly true here when there is no evidence in the record that Officer Calhoun knew of any policy or practice that would have required him to immediately go into a cell and cut down an inmate. But I guess the issue really isn't that. He's not pressing an immediate cut-down rule. He's saying if backup just keeps being delayed. Your view is it is never, as a matter of law, it is not deliberately indifferent. If they don't come, you don't have to go in. Well, it's possible that in a different factual scenario, so for example, if two hours elapse, then perhaps, yes. And Judge Higginson, you did at the beginning of this argument make the point that perhaps at some point it is reasonable to require officers to go into a cell and cut an inmate down. However, there are no cases from this circuit or any other circuit clearly establishing what that point is. And so that is— Well, if we accept that proposition and write it, aren't we creating a split with the State of Miller? The language I read to opposing counsel seems to say, sufficient facts to suggest the security defense failed to take reasonable steps. Plaintiff alleges the security officers waited to assemble an errant retreat. You know that case, right? I do. I am familiar with that case, yes. Okay, and you think that case doesn't stand for a duty to enter before you've got your security team in place? I do not. The facts of that case are somewhat unclear. There is a suggestion that one of the officers who first arrived at the scene was able to feel the inmate's pulse. That's where they actually did go in also? That's what it seems to apply because it does say that one of the officers felt the inmate's pulse and there was no pulse. So that, again, is a situation where it does appear that officers entered the cell, in which case the security concern at issue here does not exist. So I do want to quickly segue into the qualified— Our best case is Rich, which is from the— No, I mean the Fifth Circuit. Oh, from the Fifth Circuit. There really is no best case from the Fifth Circuit because none of the Fifth Circuit cases address this issue of responding to an active, ongoing suicide except for Grogan. And, again, in Grogan, that's the case where the officers just completely ignored the inmate. So there are no decisions from this circuit stating that an officer has to either immediately go in or that an officer has to go in within, say, five minutes, seven minutes, or two minutes. So, again, going to qualified immunity— I have a question before you go there. Longoria, you agree, is considerably more facts that justify the officer's refusal to get in, right? I'm sorry. Longoria, the officer was unarmed, the inmates were armed, and they were already attacking. So we said you don't have to jump into that. That is correct. But here, it's Calhoun who's armed. The suicidee, of course, is not. Well, we didn't know for certain at the time that the inmate did not have any weapons because on the video you can see one of his hands, but you cannot see the other hand. So we know in hindsight that there were no weapons. If you're in a cell and administer segregation, isn't it a fair inference that people aren't armed on the inside of the cell? They should not be. However, there are many instances where inmates can construct shanks or— You can go to the qualified immunity. Okay, thank you. So qualified immunity, again, in this case, Ms. Arenas had the burden of pointing to a specific preexisting case that clearly established that what Officer Calhoun did here was incorrect. And that burden is extremely high because the case has to dictate and truly compel the conclusion that the defendant violated the Constitution. And in the beginning of this year, the Supreme Court issued a decision in City of Escondido v. Emmons where it reiterated just how difficult it is to defeat qualified immunity. In that case, the court made it clear that the plaintiff has to identify a case where an officer acting under similar circumstances was held to have violated the Constitution. While the case does not have to be directly on point, it has to be substantially similar— And we're pretty familiar with that because the Supreme Court has spoken to it in the last several years. So we're familiar with that standard. So why don't you move to what the case law does tell us? What's the best case for your position on clearly established law at the time of this incident? Sure. Well, again, there are no cases from the Fifth Circuit that deal with this issue of how to respond to an ongoing suicide— Okay, but what does Fifth Circuit law have to do with it? In other words, Officer Calhoun would not have had any idea, this incident in Georgia, what Fifth Circuit law is. The only thing he would be charged with would be what the Supreme Court has said or what the Eleventh Circuit has said. So tell us about Supreme Court or Eleventh Circuit law as it relates to these sorts of facts involving a suicide. The Supreme Court has not addressed any case involving an inmate suicide where you are assessing an officer's reaction to an ongoing suicide. The Eleventh Circuit has not either. Do you agree with me that Fifth Circuit law has nothing to do with the qualified immunity issue on clearly established law? Yes, I would agree with that. I would say, though, that the district court did disagree and found that Fifth Circuit law was the law of the case. But regardless of which circuit you go with, whether it's the Fifth Circuit or Eleventh Circuit, neither of those circuits clearly established the law in this case. And even if you go with the Fifth Circuit, this circuit does follow other circuits, but only if there is a consensus and only if those cases are factually analogous to the case at hand. And again, there are no cases that would fit that mold, that would place Officer Calhoun's conduct clearly beyond debate. And so for that reason, we're asking the court to affirm summary judgment to Officer Calhoun on two grounds. One, he did not violate the Eighth Amendment in his response to the suicide. And number two, that he is entitled to qualified immunity in this action. Thank you. Thank you, Ms. Cusimano. Mr. Medlock, you've saved time for your vote. Your Honor, I'll begin by addressing the qualified immunity issue. And Judge Smith, your question was what is the Eleventh Circuit law that you should be considering here. Assuming that the Eleventh Circuit law is what would have informed Officer Calhoun, there's two cases that you should look at. Eleventh Circuit or Supreme Court. Eleventh Circuit or Supreme Court, of course, Your Honor. And I'd agree that the Supreme Court has not spoken to this issue specifically other than in the Taylor v. Barks case where there is discussion about a general duty to prevent suicide from inmates. The cases that you should focus on from the Eleventh Circuit are Greeson v. Kemp. There, the court affirmed denial of summary judgment and qualified immunity in the prison suicide context. A caseworker was told of a suicide attempt but, quote, did nothing with that information. That is certainly different than here. But the court in Greeson said where prison personnel directly responsible for an inmate, for inmate care, have knowledge that an inmate has attempted suicide, their failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference. That would certainly tell Officer Calhoun that in this situation where he knows that Mr. Tavera is going to die, if intervention doesn't happen soon, that he had a duty to prevent that. The second Eleventh Circuit case that you should look at is Bozeman v. Orem. What this case is really about is an emergency medical response. And by this case, I mean the case that you're considering today. Bozeman v. Orem is a case where officers knew that an inmate was asphyxiating but delayed either providing CPR or obtaining medical assistance. That's the same facts that we have here today when you boil it down to what was actually going on with Mr. Tavera. He knew that he was asphyxiating. Officer Calhoun testified he did not believe that this was a fake attempt, but he still did nothing during the critical minutes when it would have been necessary. Suppose in the case you cite that was a single officer? I believe there were a few officers. There was more than one officer there at the time, Your Honor. That's what it all comes down to for me here. It makes sense there's a duty to enter and assist when you've got more than one person. Of course, qualified immunity doesn't require a case directly on point. It just requires that there be fair warning to the officer. That's been the law since Hope v. Pelzer. Combined, Greeson and Bozeman certainly would give fair warning that you can't let an inmate asphyxiate in front of yourself, especially in the suicide context. Do you agree that once the second officer arrives, Sergeant Shelby, the decision-making responsibility is shifted to him? I would say that there's certainly an argument that he was following orders, but the Eleventh Circuit has also said in O'Rourke, and I'm blanking on the opposing party, I'll get that citation for you, that in O'Rourke, even if the officer is not, quote, the mastermind of the policy, they are still responsible for their own actions, and that at that point when there's three officers there, we know that they're there within the time frame that could make a difference for Mr. Tavera, and there's no dispute that those officers are doing nothing at that point. Judge Smith, to answer your questions about the policy, I misspoke. The correct page is 509. The section begins in 508. Yeah, we don't need to waste any more time on that. Yes, the policy does, however, apply to all the prisons. Look at page 498. They are relying on the exception to the policy that applies in county facilities and in transition centers, not the general statement of the policy which applies at all prisons. That we are parsing the policy here today is exactly why this is a fact issue that should be considered by the jury. And, of course, Shelby and Dixon both testified that the policy applies. At page 671 of the record, Lieutenant Dixon was asked, do you agree you've got to follow that policy, and he responded yes. The policy, and I will admit that I've not read this circuit's new opinion from Ioffe v. Louisville, but that is obviously not a prison case, whereas the prison cases from the Tenth Circuit in Tavoya, the Seventh Circuit in the State of Clark, and the Sixth Circuit of Nelani all discuss application of a prison in the deliberate indifference context in the context of a prison. While we recognize that a deliberate indifference is a high bar, this Court said in Jacobs that officers can be liable even when instituting some preventative measures. There's no dispute here that Officer Calhoun waited and did very little after the first 90 seconds when the policy commanded him to immediately enter the cell to cut down Mr. Tavera. For that reason, the Court should reverse and remand for trial. If you agree that an officer is not obligated to endanger themselves, what's your clearest answer? The Constitution requires Calhoun to do what between after he calls but before they arrive? Well, I would say that an officer is certainly not always required to always not endanger themselves. You look at the fight cases like the Eighth Circuit's opinion in Williams v. Mueller and the Fourth Circuit's opinion in Odom v. South Carolina. My position is the Constitution requires him after he calls, but he's alone, and before others come, to do what? To enter the cell and cut down Mr. Tavera like the policy requires him to. All right. Thank you, Mr. Medlock. Your case is under submission.